State of Wisconsin, Plaintiff-Respondent,

v.

Ralph D. Armstrong, Defendant-Appellant.

Supreme Court

*No. 81–2336–CR. Argued November 4, 1982.— Decided February 3, 1983.*

(Also reported in 329 N.W.2d 386.)

558

For the appellant there were briefs and oral argument by *Edward G. Krueger*, Madison.

For the respondent the cause was argued by *Edward S. Marion,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J.   This appeal is before this court by grant of a petition to bypass the court of appeals filed by the state pursuant to sec. 808.05, Stats., and Rule 809.60 1979–80. The appeal is from a judgment of the circuit court for Dane county, Hon. Michael D. Torphy, Jr., presiding, finding the defendant, Ralph D. Armstrong, guilty of violating sec. 940.01(1)[1] (first-degree murder) and sec. 940.225(1)(a)[2] (first degree sexual assault) and from an order denying the defendant's motion for post-conviction relief. The trial was to a jury.

There are four issues raised on this appeal. The principal issue concerns the state's use of hypnosis in an effort to refresh the recollection of Riccie Orebia.[3] The specific issue is: Did the state's use of hypnosis in an effort to enhance the recollection of a witness to a crime render inadmissible the subsequent identification by such witness of the defendant in a lineup and the subsequent in-court testimony of the witness regarding the events which were the subject of hypnosis?

The second issue is: Was the lineup identification of the defendant, under the totality of circumstances sur-

[1] Section 940.01(1), Stats. 1979, reads:

"940.01   First-degree murder.   (1) Whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony."

[2] Section 940.225(1)(a), Stats. 1979, reads:

"940.225   Sexual assault.   (1) FIRST DEGREE SEXUAL ASSAULT. Whoever does any of the following is guilty of a Class B felony:

"(a) Has sexual contact or sexual intercourse with another person without consent of that person and causes pregnancy or great bodily harm to that person.

[3] Riccie Orebia claims to be a male tranvestite. During the course of proceedings in the trial court, Orebia was consistently referred to by the use of the feminine pronoun which designation is continued in this opinion.

rounding the procedure, sufficiently reliable so that such out-of-court identification could properly be admitted into evidence?

The third issue is: Was a color photograph of the victim taken at the scene of the homicide so inflammatory and prejudicial to the defendant that the trial judge abused his discretion in allowing it sent to the jury room?

The fourth and final issue is: Did the state breach its duty to disclose exculpatory evidence to the defendant when it failed to provide the defendant with an accurate copy of a parking ticket which had been received by the defendant and paid for by him with his check?

As to the first issue: we hold that the state, or other proponent, may use hypnosis to refresh the recollection of a witness to a crime providing that the proponent demonstrates that the subsequent hypnotically affected identification and testimony was not the result of an impermissibly suggestive hypnosis session and provided further that the other side is allowed to present to the jury expert testimony regarding the effect of hypnosis on recall. If challenged, the admissibility of a hypnotically affected identification or in-court testimony is to be determined by the court, preferably in a pretrial suppression hearing. The proponent has the burden of demonstrating at such hearing to the satisfaction of the judge acting within his discretion that the conduct of the hypnosis session did not make the witness' testimony unreliable. Those requirements having been met in this case, we hold it was not error nor an abuse of discretion to admit the testimony of the previously hypnotized witness.

We also hold that the lineup procedure used by the state was not impermissibly suggestive. We further conclude that the trial judge did not abuse his discretion in allowing a photograph of the victim into the jury room nor did the state violate its duty to disclose exculpatory evidence to the defendant.

We therefore affirm the judgment and order of the trial court.

Charise Kamps, the victim, was brutally sexually assaulted and murdered early on the morning of June 24, 1980.

Ms. Kamps had been in the company of the defendant, his brother, Steve Armstrong, the defendant's fiancee, Jane May, and others the evening of June 23, 1980. During the course of the evening, the defendant, Kamps, and the others consumed cocaine and alcohol and smoked marijuana. Following a party at Ms. May's and dinner at a Madison restaurant, the defendant, Kamps and May went to a friend's house and then back to May's to watch television.

Shortly thereafter, according to the defendant's testimony, he and Kamps went to her apartment to have a drink and listen to records. They then went out, purchased cocaine and then returned to May's house. At approximately 10:45 p.m., according to the trial testimony of both the defendant and May, Kamps left May's to return to her apartment.[4] The defendant testified that he left May's for his apartment ten to twenty minutes later but ultimately returned to May's by 1 a.m. on June 24, 1980. May testified the defendant could have arrived back at her place as late as 3:30 a.m. but also admitted she had told friends that he had not returned all night. The latest time Kamps was known to be alive was between 11 and 11:30 p.m., when she called a friend in Prairie du Chien.

Brian Dillman, the victim's boyfriend, tried calling her from McGregor, Iowa, early in the morning of June 24, 1980, but the phone line was busy. After he failed repeatedly to reach her at home or at work, he called Jane May and asked her to check on Kamps. She went to

---

[4] In the early stages of the investigation the defendant claimed he and Ms. Kamps had been together in his apartment on June 23, 1980, for about an hour beginning at 11:15 or 11:30 p.m.

Kamps' apartment and discovered Kamps' body at about 12:40 p.m. on June 24, 1980. She then went to the shop she managed and notified the police of the murder. She also called the defendant, told him what happened and asked him to come to the Kamps apartment, which he did.

In the course of the ensuing investigation, the defendant was interviewed by police regarding the events of June 23–24, 1980. He voluntarily submitted to a test which showed he had traces of blood under his fingernails and toenails and on his watch band. He attributed the blood to a cut on his knee and the fact that he had engaged in sexual relations with his girlfriend during her menstrual period. Other physical evidence connecting the defendant to Kamps' apartment was also found.

Doctor Robert Huntington, a pathologist, placed the time of Kamps' death at between midnight and 3:30 a.m. The defendant had testified that he was back in his apartment by midnight and was back with May by 1 a.m. The state countered the defendant's testimony with the testimony of Riccie Orebia. Orebia lived in the house next to Kamps' apartment building and sat on the porch of the house from 10:30 p.m. on June 23, 1980, until about 3:45 a.m. the next morning. At about 12:45 a.m., she saw a man she later identified as the defendant, in an older model white car with a black top driving down the street. The car turned a corner and a short while later came down the street again and parked in a lot across from the Kamps apartment. She saw a man cross the street and go into Kamps' building. A short while later he came out and crossed the street. About five minutes later, she saw the man cross the street again and go into the building and come out about five minutes later. This time he had no shirt on and she noticed he was muscular. Another five minutes passed and Orebia saw the man cross the street again and go into Kamps' building. He was shirtless and was running. About

twenty minutes later, she saw the man exit the building. He was running faster than before. She testified that his skin was "shining." Six or seven minutes later she saw him in the white car with the black top driving out of the parking lot "very fast."

In an effort to refresh Ms. Orebia's recollection of the events she had witnessed on the morning of June 24, 1980, the police asked her to submit to hypnosis. The hypnosis session was conducted by Doctor Roger A. McKinley five days after the murder. Prior to being hypnotized, Orebia described the person she saw as being "pretty well-built," with big arms and a flat stomach, and having long dark hair. She also was very positive in stating she would be able to identify the man if she saw him again. She described the car she had seen as white with a black top and "pretty old."

Under hypnosis, Orebia's description remained substantially the same. She described the man as having dark, wavy hair covering the back of his neck, and as being of medium height with big arms, small stomach, fat nose and bushy, dark eyebrows.

Following the hypnosis session, Orebia viewed a lineup which included the defendant. All of the participants in the lineup were approximately the same height and two men had been provided with wigs "to have their hair more like everyone elses."

The lineup was conducted by having each participant handcuffed and led across the street near where Orebia had seen the man the morning of June 24, 1980. Each participant was accompanied by two officers. The defendant was the second subject to be viewed. He refused to cooperate and went limp as he was led across the street. Two other lineup participants also were carried across the street. As the defendant's head became visible above some bushes at the scene, Orebia gasped and stated, "Oh my God, that's him." The defendant was

subsequently arrested and charged with first-degree murder and first degree sexual assault.

The defendant made two suppression motions before trial. The first sought suppression of Orebia's lineup identification on the ground that the lineup was impermissibly suggestive. The second sought suppression of statements relative to identification made by Orebia subsequent to hypnosis.

A hearing was conducted on these motions. Extensive testimony was taken on the subject of hypnosis in general and on the hypnosis session with Orebia. It was agreed that the state would have the burden of proceeding on the issue of reliability regarding any statements relative to identification made by Orebia subsequent to hypnosis.

Following the hearing, the trial judge issued a joint decision on both suppression motions. He determined that the lineup procedure used was not impermissibly suggestive. He further determined that, while some suggestion regarding the defendant's height might have occurred during the hypnosis session, Orebia's lineup identification was made on the basis of his face and head. Further, since the defendant was "limp" at the time, his height was not readily apparent. The court concluded that the Orebia lineup identification and future testimony could be used because "other than theoretically, no suggestiveness of the hypnosis has been shown to affect the description [of the defendant] by Orebia in this case."

The trial began on March 18, 1981. As part of the state's case, Orebia testified to the events she had witnessed the morning of June 24, 1980. In its case-in-chief, the state did not introduce any testimony that Orebia had been hypnotized. The hypnosis issue was raised first by the defendant on his cross-examination of Orebia. As part of the defendant's case, Doctor John F. Kihlstrom testified, giving his opinion as to the effect

of hypnosis on memory. He criticized the procedure used by Doctor McKinley in the hypnosis session with Orebia.

In the state's rebuttal, Doctor McKinley testified as to the conduct of his hypnosis session with Orebia. He concluded, to a reasonable degree of scientific certainty, that there was nothing in the hypnotic session that would have caused Orebia to identify the defendant rather than any other person in the lineup.

On March 24, 1981, the jury found the defendant guilty of first-degree murder and first degree sexual assault.

In determining whether the testimony of a witness who has been hypnotized is admissible as evidence, it is necessary to consider how hypnosis may influence memory.

The phenomenon of hypnosis is generally recognized by psychologists.[5] While there are a number of theories as to what produces the hypnotic state,[6] there is a wider consensus as to the effects on memory once hypnosis occurs.

Several recent clinical reports and experiments conclude that "the recall of information regarding real-world experiences is enhanced under hypnosis."[7]

Although memory may be enhanced by the use of hypnosis, there are problems which attend the enhancement. Many experts have found that hypnotized persons "recall" both accurate and inaccurate information.[8] There are two reasons for this phenomenon.

[5] In 1960, the American Psychological Association recognized the phenomenon of hypnosis. Note, *The Admissibility of Testimony Influenced By Hypnosis*, 67 Va. L. Rev. 1203, 1206 (1981), citing, E. Hilgard, *Hypnotic Susceptibility*, at p. 4 (1965).

[6] For reviews of the various theoretical explanations of hypnosis, see H. Grasilneck and J. Hall, *Clinical Hypnosis: Principles and Applications*, at pp. 13–30 (1975).

[7] 67 Va. L. Rev. at 1210. *See* particularly the experiment conducted by F. De Piano cited in fn. 57 at p. 1211.

[8] 67 Va. L. Rev. at 1211, citing, Loftus and Loftus, *On The Permanence Of Stored Information In The Human Brain*, 35 Am.

The first goes to the interaction which occurs between the hypnotized person and the hypnotist. Hypnotized persons are highly suggestible.[9] Thus, the hypnotist may consciously or unconsciously encourage a subject to produce memories which are in fact inaccurate. A recent study found that subjects under hypnosis made more errors when answering leading questions than they did when questioned in a normal waking state.[10]

The second reason is that hypnosis is similar to other forms of memory retrieval in that when individuals lack "complete" memories of events, they tend to fill in the gaps with information they do not really remember. Doctor Orne, the defense expert on hypnosis who testified at the suppression hearing, called this phenomenon "confabulation." Doctor Orne agreed that "confabulation" normally occurred without any hypnotic procedure.

Thus, while hypnosis may enhance factual recall, some of the recall may be inaccurate.

Other jurisdictions are divided on the question of allowing the use of hypnotically affected testimony. Some states have adopted rules which either exclude all testimony of a witness who has been hypnotized or exclude that testimony related to subjects inquired into under hypnosis.[11] Other jurisdictions have refused to adopt

Psychologist 409, 415 (1980) and Orne, *The Use and Misuse of Hypnosis in Court*, 27 Int'l J. Clinical and Experimental Hypnosis, 311, 319 (1979).

[9] 67 Va. L. Rev. at 1212 and Putnam, *Hypnosis And Distortions In Eyewitness Memory*, 27 Int'l J. Clinical And Experimental Hypnosis 437 (1979).

[10] *See* iPutnam, 27 Int'l. J. Clinical And Experimental Hypnosis at 444.

[11] *See, Collins v. State*, 52 Md. App. 186, 447 A.2d 1272, 1283 (1982); *State v. Mack*, 292 N.W.2d 764, 772 (Minn. 1980); *State v. Palmer*, 210 Neb. 206, 313 N.W.2d 648, 655 (1981); *People v. Shirley*, 181 Cal. Rptr. 243, 641 P.2d 775, 804 (1982); *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274, 1280 (1981); *People*

a *per se* ban and instead have adopted a case-by-case approach as to the admissibility of such testimony.[12]

The most frequently employed rationale used to support a *per se* ban on the use of hypnotically affected testimony is that hypnosis as a memory enhancing technique fails to meet the general test for the admission of evidence resulting from the use of a new scientific technique originally articulated in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923).[13] The *Frye* test requires that before expert scientific opinion can be admitted, the appropriate scientific discipline must generally accept as valid and reliable the scientific technique from which the evidence underlying the testimony is derived. 293 F. at 1014.

Even if this court applied the test set out in *Frye,* that test could not be used to determine the admissibility of hypnotically affected testimony.[14] *Frye* applied to the admissibility of "expert testimony deduced from a well-recognized scientific principle." 293 F. at 1014. Here, it is not expert testimony that is challenged. Rather, it

---

*v. Gonzales,* 108 Mich. App. 145, 310 N.W.2d 306, 314 (1981); *People v. Hughes,* 452 N.Y.S.2d 929, 932 (1982).

[12] *See, Chapman v. State,* 638 P.2d 1280 (Wyo. 1982); *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981); *State v. McQueen,* 295 N.C. 96, 244 S.E.2d 414 (1978); *Creamer v. State,* 232 Ga. 136, 205 S.E.2d 240 (1974); *State v. Beachum,* 643 P.2d 246 (N.M. Ct. App. 1982); *State v. Greer,* 609 S.W.2d 423 (Mo. Ct. App. 1980); *People v. Smrekar,* 68 Ill. App. 3d 379, 24 Ill. Dec. 707, 385 N.E.2d 848 (1979); *Clark v. State,* 379 So. 2d 372 (Fla. Dist. Ct. App. 1979); *United States v. Awkard,* 597 F.2d 667 (9th Cir. 1979).

[13] *Palmer,* 313 N.W.2d at 655; *Shirley,* 641 P.2d at 804; *Collins,* 447 A.2d at 1283; *Mena,* 624 P.2d at 1279; *Hughes,* 452 N.Y.S.2d at 932; *Mack,* 292 N.W.2d at 768; *Gonzales,* 310 N.W.2d at 314.

[14] If *Frye* could be viewed as applicable to this case, there is a strong argument that the test would be met. The phenomenon of hypnosis has been accepted by the appropriate scientific discipline. *See,* fn. 5, *supra.*

is the admissibility of an eyewitness' post-hypnosis identification which is in question.

In the case of expert testimony deduced from a scientific technique, under *Frye*, as an initial matter, it is the technique which is in effect on trial before the court. However, the trial judge is not required to do an independent examination as to the scientific principles which underlie the technique. He does not have to have experiments conducted in court to verify the reliability of the technique. Instead, he evaluates the opinions of people who have spent sufficient time in the study of the field to qualify as an "expert." If there is a sufficient number of "experts" who accept the validity of the technique, the judge will allow an expert to testify regarding deductions he has made from that technique.

But it is not the reliability of hypnosis to put one in a hypnotic trance that is at issue when the witness testifies. It is the reliability of a specific human memory as affected by hypnosis that must be examined. There are no experts who can testify as to what specific effects hypnosis has had on the witness' memory; just as there are no experts who can testify that a normal waking memory of an event is in fact a completely accurate representation of what actually occurred. The most a trial judge can do is review the hypnotic session to ensure that no impermissible suggestiveness has occurred. However, in such a review, it is not the reliability of hypnosis that is to be examined. Rather, it is the effect of a specific hypnotic session that is to be determined.

We conclude that the test set out in *Frye* is inapplicable to this case.

The defendant argues in support of a *per se* ban that allowing the use of this testimony should be viewed as a denial of the defendant's constitutional right to confront and cross-examine the witnesses against him.[15] At least

---

[15] United States Constitution, Amendment VI; *See, Pointer v. Texas,* 380 U.S. 400, 406–407 (1965).

two courts have accepted this argument as grounds for excluding the use of hypnotically affected testimony.[16]

The rationale underlying this argument is that the use of hypnosis has a tendency to strengthen the witness' confidence in the validity of his recollection. Some experts claim that whether the witness' memory is accurate or inaccurate, the witness will believe his own testimony. The defendant argues that the jury, in assessing the credibility of a previously hypnotized witness' testimony, will be more apt to see a confident witness and thus will be unable to determine credibility by viewing the witness' conduct, appearance and demeanor and clarity of recollection.[17]

While some authorities conclude that a witness' confidence in his testimony is strengthened by the use of hypnosis,[18] this does not mean the defendant is denied his right to confrontation. Other forms of refreshed recollection can produce a similar confidence in the witness. In order to assist the jury in assessing the witness' credibility, the defendant is able to present evidence on the witness' prehypnosis recollection of the events in question. The defendant is also able to present expert testimony regarding the effect hypnosis has on the confidence the witness has in his recollection. In the recently decided case of *State v. Bauer*,[19] this court noted that, "The primary purpose of the confrontation right is to ensure that the trier of fact has a satisfactory basis for evaluating the truthfulness of evidence admitted in a criminal case."[20]

[16] *Mena*, 624 P.2d at 1280; *Mack*, 292 N.W.2d at 769.

[17] *See, Wisconsin Jury Instruction—Criminal 300.*

[18] *See, Encyclopedia Britannica:* Macropaedia, Hypnosis, 133, 136 (1979).

[19] 109 Wis. 2d 204, 325 N.W.2d 857 (1982).

[20] *Id.* at 208.

We hold this purpose is satisfied if the defendant has the opportunity to cross-examine the witness and is permitted to introduce testimony on the witness' prehypnosis recollection and on the effect hypnosis can have on memory.

A review of the record in this case shows that these conditions have been satisfied. The defendant's attorney cross-examined Orebia at length. Orebia's prehypnosis recollections were brought out. The defendant produced expert testimony on the effect of hypnosis on recall. The defendant's expert testified that there is no way to determine whether a hypnotized person's recollection is accurate or not; he testified that a person's ability to reflect critically on what has happened is diminished; he testified that, in his opinion, an improper procedure was employed in hypnotizing Orebia; and he testified about what he "believed to be the most significant departures from the safeguard procedures that are what are [sic] employed in cases of this kind." In short, the jury was given a basis for evaluating the truth of Orebia's testimony. The defendant's right to confrontation was not violated in this case.

We conclude that a *per se* ban on the use of hypnotically affected testimony is unwarranted.

Jurisdictions which allow the admission of hypnotically affected testimony do so under a variety of different conditions. Some jurisdictions allow such testimony unconditionally with the possible effects of hypnosis going to the weight of the testimony and not its admissibility.[21] Other jurisdictions require a pretrial hearing on the possible effects of hypnosis.[22] We conclude the latter approach is preferable.

---

[21] *Smrekar*, 385 N.E.2d at 853; *Chapman*, 638 P.2d at 1284–1285.

[22] *Hurd*, 432 A.2d at 95; *Beachum*, 643 P.2d at 254.

The hypnosis of an individual results in that person being highly susceptible to suggestions made during the hypnotic session. Suggestions made by the hypnotist concerning the identification of the suspect or the substance of the events witnessed can become incorporated into the subject's memory. Because of this, it is important for the trial judge to review the hypnosis session to ensure that no impermissible suggestiveness attended the procedure.

Ordinarily, where the issue of the suggestiveness of an identification procedure is raised, the defense has the burden of demonstrating the suggestiveness. *Neil v. Biggers,* 409 U.S. 188, 196 (1972). However, because of the great susceptibility a hypnotized subject has to suggestions made by the hypnotist, we conclude that in criminal cases, where the state or a defendant is attempting to use hypnotically affected testimony, the burden should be on the proponent to demonstrate that the hypnotic session was not affected by impermissible suggestiveness such as to render the subsequent testimony inadmissible.[23] If the state or the defendant propose

---

[23] To aid the trial court in determining whether the hypnotic session was characterized by undue suggestiveness, we suggest that the judge review the session with guidelines similar to the ones set out below in mind. The guidelines were originally formulated by Milwaukee County Circuit Judge Ted E. Wedemeyer in *State v. White,* (Case No. J–3665, decided March 17, 1979) and are quoted with approval in Warner, *The Use of Hypnosis in the Defense of Criminal Cases,* 27 Int'l. Journal of Clinical & Experimental Hypnosis, 417, 428–429 (1979) and are based on a set of four guidelines originally suggested by Doctor Orne. Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int'l. Journal of Clinical & Experimental Hypnosis, 311, 335–336 (1979). The guidelines are as follows:

"1. The person administering the hypnotic session ought to be a mental health person with special training in the use of hypnosis, preferably a psychiatrist or a psychologist.

to introduce the testimony of a witness who has been hypnotized, that fact should be revealed to the other

"2. This specially trained person should not be informed about the case verbally. Rather, such person should receive a written memorandum outlining whatever facts are necessary to know. Care should be exercised to avoid any communication that might influence the person's opinion.

"3. Said specially trained person should be an independent professional not responsible to the prosecution, investigators or the defense.

"4. All contact between the specially trained person and the subject should be videotaped from beginning to end.

"5. Nobody representing the police or the prosecutor or the defendant should be in the same room with the specially trained person while he is working with the subject.

"6. Prior to induction a mental health professional should examine the subject to exclude the possibility that the subject is physically or mentally ill and to confirm that the subject possesses sufficient judgment, intelligence, and reason to comprehend what is happening.

"7. The specially trained person should elicit a detailed description of the facts as the subject believes them to be prior to the use of hypnosis.

"8. The specially trained person should strive to avoid adding any new elements to the subject's description of her/his experience, including any implicit or explicit cues during the pre-session contact, the actual hypnosis and the post-session contact.

"9. Consideration should be given to any other evidence tending to corroborate or challenge the information garnered during the trance or as a result of post-hypnotic suggestion. . . ."

The above are merely guidelines, not imperatives; others could be equally helpful. If the state complies with these or similar guidelines, the trial judge's task of assessing the presence of suggestiveness in the hypnotic session would be facilitated. However, compliance with the guidelines does not guarantee that the hypnotized witness' testimony will be admitted. Nor does the failure to comply with the guidelines require exclusion. The central inquiry remains whether, as a result of events occurring during the hypnosis session, any subsequent statements made by the hypnotized subject should be considered so unreliable as not to be admissable at trial.

side before trial so that a timely motion to suppress may be made and a suppression hearing held.

If the trial judge in the exercise of discretion determines that the testimony of a witness who has undergone hypnosis may be admitted, the defendant then may attack the credibility of the witness by raising the hypnosis issue. Because of what some commentators refer to as a "popular misconception that hypnotized people always tell the truth,"[24] the state should not reveal the fact of hypnosis in its case-in-chief. However, if the hypnosis issue is raised by the defense, the state should be allowed to introduce expert testimony on hypnosis to aid in the jury's assessment of the witness' credibility. Such a rule will allow the defendant to challenge the credibility of the witness without the danger that the jury will give undue weight to the testimony because hypnosis was used. It will also satisfy a defendant's right to confrontation in that the defendant will be in a position to ensure that the jury has a satisfactory basis for evaluating the witness' testimony.

Similarly, if the defendant is permitted to introduce testimony of a previously hypnotized witness, both sides should be permitted to introduce expert testimony on the effects of hypnosis on memory.

Applying the framework set out above to the facts of this case, we conclude that the trial judge in the exercise of his discretion properly admitted the testimony and the out-of-court identification by Orebia.

The defendant asserts that because the guidelines suggested by Judge Wedemeyer[25] were not followed, it is impossible to determine the reliability of Orebia's post-hypnotic identification and testimony. The defendant further contends that the videotape of the hypnosis ses-

---

[24] 67 Va. L. Rev. at 1222.

[25] See fn. 23.

.sion clearly shows that suggestions were made to Orebia to the effect that the person she saw on the morning of June 14, 1980, was actually taller than her original description had indicated. The defendant finally claims that confabulation can be shown to have occurred during the hypnosis session because Orebia added to her description the facial features of "a fat nose" and "bushy, dark eyebrows"—features which she could not have discerned under the lighting conditions existing that morning.

In determining whether events which occurred during the hypnosis ssssion are such as to render any subsequent statements by the hypnotized subject unreliable, the trial court should examine the session with two tests in mind. First, there should be a determination of whether there was unnecessary suggestiveness in the hypnotic process. Second, the court should take into account the fact that some confabulation may occur during hypnosis and thus the court should determine whether, under the totality of the circumstances of the information seeking process, the post-hypnotic statements of the witness are reliable.

A review of the record supports the conclusion of the trial judge that nothing occurred during the hypnosis session which would make any subsequent statements by Orebia unreliable.

The record shows that the hypnotist may have made some unnecessary suggestions with regard to the suspect's height. However, as the trial court noted in its decision on the defendant's suppression motions, height could not have been a factor in the defendant's identification of the defendant because the defendant's height was not readily apparent during the lineup; the defendant had gone limp and was being carried by two police officers. In addition, because the lineup included only people who were approximately the same height as the defend-

ant, any suggestions regarding height which might have been incorporated into Orebia's memory would not have caused Orebia to pick out the defendant rather than any other person in the lineup.

The same holds true for the possible confabulation by Orebia of the facial features of the person she had seen the morning of June 24, 1980. Under hypnosis, Orebia described a person who had a "fat nose" and "bushy, dark eyebrows." At trial, however, she stated she could not recall anything about the facial features of the person she had seen. Even assuming that these facial features were inaccurate memories and were in fact incorporated into Orebia's memory, the defendant has failed to demonstrate a correlation between those characteristics and his identification.

A review of the exhibit picturing the lineup participants shows nothing that would have caused Orebia to pick the defendant out of the lineup over any of the others even if (contrary to her testimony) the nose and eyebrow description were then a part of her "memory." Thus, any possible confabulation which might have occurred cannot be said to have rendered Orebia's post-hypnotic statements unreliable.

Finally, after reviewing the totality of circumstances surrounding the information seeking process, we conclude Orebia's post-hypnotic statements are not inadmissible. Comparing Orebia's pre- and post-hypnotic descriptions of the person she saw the morning of June 24, 1980, we note that the descriptions are substantially the same.

We are not presented here with the classic case of a witness with post-traumatic amnesia regaining total recall following hypnosis. Rather, we have a witness whose pre- and post-hypnotic description of the defendant is substantially the same. In addition, Orebia, prior to hypnosis, was definite in her assertion that she would be

able to identify the man she saw go in and out of the victim's apartment.

We therefore conclude that Orebia's identification of the defendant in the lineup and her subsequent testimony at trial were not required to be excluded from evidence because she had undergone hypnosis in an effort to refresh her recollection.

The second issue considered on this appeal is whether the lineup identification of the defendant was, under the totality of circumstances surrounding the procedure, sufficiently reliable so that the out-of-court identification by Orebia could properly be admitted into evidence.

The defendant contends that the procedure used in the lineup in question was ". . . so unnecessarily suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law." *Stovall v. Denno,* 388 U.S. 293, 302 (1967). As ground for this assertion, the defendant claims that impermissible suggestiveness resulted from (1) the use of hypnosis on the eyewitness prior to the lineup; (2) the fact that the participants in the lineup were shown to the witness sequentially rather than in a group; (3) the fact that all of the lineup participants were approximately the same height but none was the height of the person the witness had originally described; and finally, (4) the fact that the extensive security precautions surrounding the on-the-scene procedure acted to persuade Orebia to make an identification.

The hypnosis issue has been dealt with.

As to the defendant's other claims, the question is whether the identification procedure employed by the state caused ". . . a very substantial likelihood of irreparable misidentification."[26] The test for determining the admissibility of an out-of-court identification has

---

[26] *Powell v. State,* 86 Wis. 2d 51, 64, 271 N.W.2d 610 (1978) citing *Neil v. Biggers,* 409 U.S. 188, 198–199 (1972).

two parts: "First, the court must determine whether the identification procedure was impermissibly suggestive. Second, it must decide whether under the totality of the circumstances the out-of-court identification was reliable, despite the suggestiveness of the procedures."[27] The defendant has the burden of showing the out-of-court identification was improper.[28]

We conclude the defendant has not met his burden. The fact that the lineup participants were all approximately the same height and were shown to the witness sequentially rather than in a group could not have led to the irreparable misidentification of the defendant rather than another lineup participant. While extensive security precautions might push a witness to make an identification, the incentive to identify someone is no greater than that existing in an ordinary lineup situation. There is no reason why, because of the security precautions, the witness should identify the defendant rather than one of the others.

We reach this conclusion aware that, as the United States Supreme Court noted in *Stovall*, "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." 388 U.S. at 302. The defendant claims that a sequential lineup has the same effect as showing a suspect one-on-one to a witness. We disagree. When only one person is shown to a witness, there is a strong implication that the person displayed is in fact the guilty party. However, in a sequential lineup, the witness sees both the suspect and a number of people who are not suspects. Although the witness has an opportunity to view each person apart from the rest of the group, this procedure does not operate to suggest that any one person

[27] *Powell*, 86 Wis. 2d at 65.
[28] *Id.* at 65.

in the lineup is in fact the person who the witness should identify.

Although we find the procedure used in the lineup was not impermissibly suggestive, we also conclude that, if the lineup could be said to be suggestive, nonetheless, under the totality of the circumstances surrounding the procedure, the identification was reliable. As stated in *Neil v. Biggers*, 409 U.S. at 199–200:

". . . the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Here, Orebia had numerous opportunities to view the defendant as he went in and out of Kamp's apartment building and her attention was drawn to him because of his unusual behavior. With the exception of her estimate of the height of the person she saw, Orebia's description fit the defendant. Orebia expressed certainty that she could identify the person she had seen prior to hypnosis. Following hypnosis and at the time of the confrontation, Orebia identified the defendant as the person she had seen. Finally, there was less than one week's time between the crime and the subsequent hypnosis session and identification. Thus, under the totality of the circumstances, we conclude Orebia's identification of the defendant was properly admitted.

We conclude that lineup identification testimony was properly admitted.

The third issue on appeal is whether a color photograph of the victim at the scene of the homicide was so inflammatory and prejudicial to the defendant that the

trial judge abused his discretion in allowing it sent to the jury room.

Two photographs of the victim's body were received in evidence without defense objections. They are very similar. They show the victim nude, lying on her face, with blood smeared on her back, buttocks and thighs. The defendant objected to sending in one of them to the jury room. He claims he was prejudiced by allowing the photograph sent to the jury.

"Whether photographs are to be sent to the jury room is a matter of the trial court's discretion." *Hammen v. State,* 87 Wis. 2d 791, 802, 275 N.W.2d 709 (1979). The reason for this rule is that the trial judge, ". . . better than anyone else, in light of the evidence, can make the determination that the photographs will assist the jury in a rational and dispassionate determination of the facts." 87 Wis. 2d at 802–803 citing *Hayzes v. State,* 64 Wis. 2d 189, 200, 218 N.W.2d 717 (1974). We will uphold the trial court's decision unless his conclusion is wholly unreasonable or the only purpose of the photograph was to inflame and prejudice the jury. 87 Wis. 2d at 803.

We conclude that the trial judge could reasonably decide that the photograph in question could assist the jury in their assessment of the physical evidence connecting the defendant to the crime and that the purpose was not merely to inflame or prejudice the jury. The trial judge did not abuse his discretion in allowing the photograph sent to the jury room.

The final issue on appeal is whether the state breached its duty to disclose exculpatory evidence[29] to the defendant when it failed to provide the defendant with an accurate copy of a parking ticket which had been received by the defendant and paid for by check.

---

[29] *Brady v. Maryland,* 373 U.S. 83, 87 (1963).

The state challenges the defendant's contention that the parking ticket in question was exculpatory. However, assuming that the evidence was exculpatory, the state's duty to disclose covers only evidence within the state's exclusive possession. *State v. Amundson,* 69 Wis. 2d 554, 573, 230 N.W.2d 775 (1975).

The evidence here was not in the exclusive possession of the state. The defendant knew he had been ticketed. He paid the ticket by check and the cancelled check was returned to him. The state did not breach its duty to disclose exculpatory evidence to the defendant.

In summary, we conclude it was not error to admit into evidence the post-hypnotic identification and testimony of one of the state's witnesses. We also conclude the lineup procedure used by the state was not impermissibly suggestive. Further, we conclude that it was not an abuse of discretion to send to the jury room the photo of the victim nor did the state withhold exculpatory evidence from the defendant in violation of the defendant's constitutional rights.

We therefore conclude that the judgment of conviction and the post-conviction order denying the defendant's request for relief should be affirmed.

*By the Court.*—Judgment and order of the trial court affirmed.