**UNITED STATES, Appellee,**

v.

**Private E–2 Lacy M. HARRINGTON, SSN 217–84–1353, United States Army, Appellant.**

**CM 442125.**

U.S. Army Court of Military Review.

31 Aug. 1984.

Captain Marcus C. McCarty, JAGC, and Luther C. West, Esquire, argued the cause for the appellant. With them on the brief were Colonel William G. Eckhardt, JAGC, Lieutenant Colonel William P. Heaston, JAGC, and Major Lawrence F. Klar, JAGC.

Captain John Plotkin, JAGC, argued the cause for the appellee. With him on the brief were Colonel James Kucera, JAGC, Lieutenant Colonel John T. Edwards, JAGC, Major Patrick M. Flachs, JAGC, and Captain Edmond R. McCarthy, Jr., JAGC.

Before McKAY, SU–BROWN and CO-HEN, Appellate Military Judges.

## OPINION OF THE COURT AND ACTION ON PETITION FOR NEW TRIAL

### SU–BROWN, Senior Judge.

What began as a routine annual qualification firing of the M–16 on the Ingman Firing Range at Camp Casey, Korea, culminated in the senseless deaths of four servicemen and serious injury to a fifth. Several of the victims fell prey to Specialist Four (SP4) Archie Bell, a mentally disturbed soldier who professed the belief that his wanton acts of violence would touch off an Islamic revolution. For his part in the killings, appellant was tried by a general court-martial composed of officer and enlisted members and convicted of the unpremeditated murder (Charge I) of one of the four soldiers and the attempted killing of another (Charge II).[1]

In appellant's case, primarily two pieces of evidence support the court members' verdict: the hypnotically refreshed testimony of Sergeant (SGT) Bruce Cardinal, the only surviving victim of the slaughter, and appellant's confession of 9 June 1981, made during an investigative interview after a polygraph examination. On appeal, appellant contends that neither piece of evidence should have been admitted and that a reasonable doubt exists as to his guilt. A third assignment of error asserts the military judge erred by denying appellant's request for SP4 Bell's statements made at his mental examination board. Finally, appellant petitions this Court for a new trial based upon newly discovered evidence concerning the use of hypnosis in this case.

### I

### The Facts

On 5 June 1981, the soldiers of Headquarters and Headquarters Company, 2d Engineer Battalion, went to Ingman Range to qualify with their M–16 rifles. The rifle range consisted of eight firing points located along the slopes and bottom of a steep U-shaped ravine. Looking downrange, firing Point One was located at the top of the left-hand slope of the ravine. Points Two, Three, Four and Five were on the bottom of the ravine where the range tower was located. Points Six, Seven and Eight were located on the right slope and were reached by a narrow flight of concrete steps leading to each of the three points. Point Seven had considerable foliage surrounding it which partially obstructed it from the other firing points.

---

1. Violations of Articles 118 and 80, Uniform Code of Military Justice, 10 U.S.C. §§ 918 and 880 (1976). The court members sentenced appellant to a dishonorable discharge, confinement at hard labor for 20 years, total forfeitures, and reduction to Private E–1. The convening authority approved the sentence.

After an initial safety briefing, the soldiers were divided into four firing orders. After the first and second firing orders finished firing, they proceeded off the range and the third and fourth firing orders moved to their assigned firing points. Appellant's roommate, SP4 Bell, proceeded to Point Eight while appellant went to Point Seven. A safety noncommissioned officer (NCO) was assigned to each firing point. The third firing order was to fire first while the fourth firing order served as scorers. Four magazines containing ten rounds each were placed on each scorer's table. Each firer was required to position himself in the firing pit and prepare to fire while the scorer sat to the rear behind the scorer's table. After the firers were in position, Sergeant First Class (SFC) Blake, who was in charge of the soldiers at the range, instructed the scorers over the public address system to give each firer one ten-round magazine.

Sergeant First Class Blake then ordered the firers to watch their lanes, and two or three targets were exposed. As the firing began, the attention of SP4 Mailen, the firer at Point Three, was drawn to the area above Point Six by the sound of unusual and excessive firing. He observed a black man descending quickly from Point Eight, and upon reaching Point Seven, disappearing from view. Mailen could see the heads of the scorer and safety NCOs at Point Seven looking downrange. After another burst of fire, both individuals disappeared simultaneously. Sergeant First Class Blake observed a white safety helmet rolling down the hill from Point Seven. He ordered all the firers to cease fire and to lay down their weapons. Unable to get a response from Point Seven, SFC Blake ordered the safety NCO at Point Six, SGT Cardinal, to investigate. Sergeant Cardinal ran up the steps toward Point Seven, followed by Lieutenant Kerr, the safety officer. As SGT Cardinal reached the top step, he was shot and fell back over the rail and down the hill. A witness to the shooting, SP4 Stockton, the safety NCO at Point Two, observed an unidentified man rise facing downrange, pivot, and aim his rifle in a downward direction. Although he heard a shot, SP4 Stockton did not know whether the unidentified man fired the rifle. From the perspective of the range tower, SFC Blake saw an unidentified man fire at SGT Cardinal from a kneeling position. Located across the ravine at Point One, Private First Class (PFC) Mendoza identified the firer as SP4 Bell. He said Bell had been squatting near appellant's firing pit, rose and fired at SGT Cardinal. He also observed a soldier emerge from the firing pit after the shot.

Sergeant Cardinal slid down the hill to Point Six. When asked who shot him, he said he had been shot by a "black man on Point 7." Seriously wounded, he was promptly evacuated.

Specialist Four Mailen observed appellant and Bell descending the hill side by side from Point Seven to Point Six after SGT Cardinal was shot. Shortly thereafter, Bell was observed in the vicinity of the guard shack and the tower, to the rear of the range, visibly shaking and agitated. When asked what happened, Bell exclaimed, "I don't know man. I don't believe it. I don't believe it happened," and threw his weapon down. Specialist Stockton picked up the M–16 and ejected two or three rounds. He removed the magazine and observed that it contained at least two rounds, possibly more. Appellant stood next to Bell in the vicinity of the tower. Walking over to the bleachers, Bell fainted.

Bell was revived, apprehended, and escorted to a vehicle. As he was led to the vehicle, Bell exclaimed, "I have served the revolution and done what I came for. I did it, but I am not crazy. This is the revolution." When asked by another soldier whether he had been at Point Seven, appellant replied that he did not see what was going on because he "was hiding in the bottom of the foxhole."

Special Agent (SA) Sisk and SA Tucker of the Criminal Investigation Division (CID) arrived at the scene and went to Points Six and Seven in search of a suspected sniper. The bodies of SGT E, the

safety NCO, and PFC M, the scorer, were found at Point Seven. Private First Class M's body was found on its back, its hand still holding a pencil. Private First Class M sustained one bullet wound which entered his back at waist level. The path of the bullet had a mild upward trajectory as it passed straight through his body. Sergeant E's body was also on its back with the feet toward the steps leading to Point Eight, and the head projecting over the edge of the firing point on the downhill slope, next to the steps leading down to Point Six. Sergeant E was slain by a single gunshot wound which penetrated the chest cavity from his back. Powder burns surrounded the entrance wound which indicated that the muzzle flash of the firearm occurred within six inches to two feet of the body. The CID agents proceeded to Point Eight and discovered another tragic scene, the slain bodies of the scorer and safety NCO for that point.

### a. Ballistic Evidence

Bullet fragments removed from the bodies and twenty-six cartridge cases from Point Seven were examined by the United States Army Crime Lab, Camp Zama, Japan. Bullet fragments removed from PFC M's body were linked to Bell's rifle. Fragments obtained from SGT E's body were too small for comparison purposes. The examination of the cartridges linked two of them to appellant's rifle; none could be linked to Bell's rifle.

### b. Sergeant Cardinal

Sergeant Cardinal was interviewed by SA Gardner while undergoing treatment in the hospital's intensive care unit in Korea. He told SA Gardner that he had observed a white safety helmet rolling down the hill, so he ran up the stairs to investigate. When he reached Firing Point Seven, he observed a man lying on the ground and Bell, who turned and fired. Sergeant Cardinal was interviewed again three days later. He informed SA Gardner that he had been shot by Bell at a range of fifteen feet and did not see appellant at the time of the shooting. He reiterated this account several more times during the next four weeks

but began to have doubts about the identity of his assailant. Sergeant Cardinal related his doubts to SA Krauer, who proposed that Cardinal undergo hypnosis as a means of assisting his memory.

Arrangements were made for Cardinal to meet with Doctor (Major) John Shoberg, Chief of Clinical Psychology Services at Tripler Army Medical Center, Hawaii. Doctor Shoberg had no connection with the ongoing criminal investigation and did not know that appellant was a suspect. Doctor Shoberg obtained SGT Cardinal's consent to the hypnosis and its videotaping. He then asked Cardinal to recount the shooting. Cardinal repeated what he said previously and again identified Bell as his assailant. Doctor Shoberg thereupon began to place Cardinal under hypnosis. Also present in the room were two videotape operators and SA Simpson of the CID, who observed the entire procedure. After forty minutes, Doctor Shoberg concluded that Cardinal was hypnotized. Once again, Cardinal recalled the circumstances of the shooting. He related that as he ran up the stairs to Point Seven, he observed two soldiers lying on the ground, SGT E and PFC M, and a third person by the foxhole looking downrange. The man turned so that Cardinal could see his face, it was the appellant. He rose from a kneeling position and shot Cardinal who crawled down the stairs to Point Six. Sergeant Cardinal repeated his recollection several more times, providing more detail. At the conclusion of the hypnosis, Dr. Shoberg told Cardinal that he would be able to recall in detail what he had remembered under hypnosis, with possibly even more detail.

At trial, Cardinal testified that appellant was his assailant at the rifle range.

## II

### The Hypnotically Refreshed Testimony

This case presents an issue novel to military law—whether an eye witness' post-hypnosis testimony is admissible in a criminal trial. For the reasons which follow, we find that under the facts of this case the

military judge erred in admitting SGT Cardinal's hypnotically-refreshed testimony.

Appellant argues that refreshing an individual's memory through hypnosis is a scientific method which should be tested under the analysis set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). Under the *Frye* test, hypnotically-refreshed testimony would not be admissible unless the Government could show that hypnosis has gained general acceptance as a memory enhancement technique in the scientific community.

Military courts, as well as most civilian jurisdictions, have applied the *Frye* test as the standard of reliability by which scientific evidence and expert testimony based thereon must be judged. *See United States v. Hulen,* 3 M.J. 275 (C.M.A.1977); *United States v. Ford,* 4 U.S.C.M.A. 611, 16 C.M.R. 185 (1954); *United States v. Bothwell,* 17 M.J. 684 (A.C.M.R.1983).

Many jurisdictions have held that hypnotically-refreshed testimony must satisfy the *Frye* standard of acceptability for scientific evidence before it is admissible. However, application of the *Frye* standard has not resulted in unanimity of result. Some courts have held that hypnotically-refreshed testimony is not generally accepted in the scientific community as reliable. These courts have adopted a rule of exclusion, holding that a previously hypnotized witness is incompetent to testify in a criminal trial about events which were the subject of hypnosis. *Pearson v. State,* 441 N.E.2d 468, 472 (Ind.1982). *See, e.g., State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266 (1982); *People v. Shirley,* 31 Cal.3d 18, 641 P.2d 775, 181 Cal.Rptr. 243 (1982); *Collins v. State,* 52 Md.App. 186, 447 A.2d 1272 (1982), *aff'd,* 296 Md. 670, 464 A.2d 1028 (Md.App.1983); *People v. Gonzales,* 108 Mich.App. 145, 310 N.W.2d 306 (1981); *State v. Blanchard,* 315 N.W.2d 427 (Minn.1982); *State v. Mack,* 292 N.W.2d 764 (Minn.1980); *People v. Hughes,* 88 A.D.2d 17, 452 N.Y.S.2d 929 (1982), *aff'd,* 59 N.Y.2d 523, 453 N.E.2d 484, 466 N.Y.S.2d 255 (1983); *Common-wealth v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (1981).

■ Nevertheless, the weight of authority and logic compels the conclusion that hypnotically-refreshed testimony is not inadmissible *per se* in a criminal trial. *See, e.g., United States v. Awkard,* 597 F.2d 667 (9th Cir.), *cert. denied,* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979); *Pearson v. State,* 441 N.E.2d 468 (Ind.1982); *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981); *State v. Beachum,* 97 N.M. 682, 643 P.2d 246 (N.M.Ct.App.1981). Different theories have been advanced for admitting such testimony. Some courts have held that hypnotically-refreshed testimony is admissible without addressing the *Frye* standard and that the problems inherent in hypnosis affect credibility, not admissibility. *Pearson v. State,* 441 N.E.2d at 472 and cases cited therein. *See United States v. Awkard,* 597 F.2d 667; *United States v. Adams,* 581 F.2d 193 (9th Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). *See also* Annot., 92 A.L.R.3d 442 (1979). These cases reason that testimony by victims and witnesses who have undergone pretrial hypnosis to stimulate recall should be treated the same as any other present recollection refreshed. Other courts, applying the *Frye* standard, have found that hypnotically-refreshed testimony could be admitted if certain safeguards on the hypnotic procedure were followed. *Pearson v. State,* 441 N.E.2d at 472; *State v. Hurd,* 432 A.2d at 92; *State v. Armstrong,* 110 Wis.2d 555, 329 N.W.2d 386, 393 n. 14 (1983).

■ Our review of the case law, expert testimony, and scholarly articles convince us that hypnotically-refreshed testimony satisfies the *Frye* standard and is admissible in a criminal trial if the use of hypnosis in that case was reasonably likely to result in recall comparable in accuracy to normal human memory. *See States v. Hurd,* 432 A.2d at 95. For purposes of establishing the admissibility of hypnotically-refreshed testimony, we will require the proponent of the testimony to comply with the procedures set forth by the Supreme Court of

New Jersey in *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981).

As the court in *Hurd* recognized, the potential for abuse of hypnosis and the consequent risk of injustice is so significant that the moving party should have the burden of establishing admissibility by clear and convincing evidence. *State v. Hurd*, 432 A.2d at 97. Consequently, whenever a party seeks to introduce the testimony of a witness who has undergone hypnosis, that fact must be revealed to the opposing party. The military judge, upon motion by counsel, must then determine the admissibility of the challenged testimony. After hearing expert testimony on the matter, the military judge should consider both the kind of memory loss that hypnosis was used to restore and the specific technique employed to determine whether the use of hypnosis and the procedure followed in the particular case was a reasonably reliable means of restoring the witness' memory. *State v. Hurd*, 432 A.2d at 95.

Once the military judge determines that under the particular circumstances of the case the use of hypnosis was appropriate for the memory loss encountered, the military judge must determine if the hypnosis was properly administered. The shortcomings of hypnotically-refreshed testimony, which include unconscious confabulation (subtle distortions of memory, false confidence, and suggestions emanating from the interrogator), require that the proponent of the testimony demonstrate that the following safeguards were observed. First, the interview should be conducted by an independent psychiatrist or psychologist experienced in the use of hypnosis. Second, the psychiatrist or psychologist should not be regularly employed by the prosecution or defense. Third, any information concerning the case which is revealed to the hypnotist by either party must be recorded in some manner, preferably by videotape. Fourth, a detailed statement from the witness should be obtained prior to the hypnotic session. Fifth, all contact between the hypnotist and the subject must be recorded. Sixth, and finally, only the hypnotist and the subject should be present during any phase of the hypnotic session. *See State v. Hurd*, 432 A.2d at 96–97. Several jurisdictions have employed similar safeguards as a precondition to the admissibility of hypnotically-refreshed testimony. *Pearson v. State*, 441 N.E.2d 468; *State v. Long*, 32 Wash.App. 732, 649 P.2d 845 (1982); *State v. Armstrong*, 110 Wis.2d 555, 329 N.W.2d 386.

The procedures employed in this case complied with most of the safeguards discussed above. The revival of Cardinal's memory was conducted by Dr. Shoberg, a medical services officer divorced from any law enforcement or command responsibilities, and the hypnotic session was conducted in a neutral setting, a hospital. While hypnotized, Cardinal described the events at the rifle range in his own words and not in response to leading or suggestive questions. The session was videotaped. A detailed recorded statement by Cardinal was taken before the session, allowing the factfinders to compare discrepancies in Cardinal's testimony both before and after the hypnotic session.

However, the procedural safeguards were not followed in two significant respects. First, the information given to the hypnotist, Dr. Schoberg, was not recorded, rendering it difficult for the court to determine what information the hypnotist could have communicated to SGT Cardinal either directly or through suggestion. Second, other persons were present during the hypnotic session, including at least one CID agent who participated in the session to a limited extent.

Strict compliance with every safeguard is not an absolute guarantee of, or prerequisite for, the admission of hypnotically-refreshed testimony. If adequate compliance is shown, the military judge must go one step further. He must determine whether the hypnotically-refreshed testimony carries sufficient indicia of reliability by examining the testimony in light of its internal consistency and the facts already known about the alleged incident.

In this case, the failure to exclude the CID agent from direct participation in

the session enhanced the chance of confabulation. Prior to the hypnotic session, both SGT Cardinal and the CID were aware that Bell had been declared insane and would not stand trial. As a result, SGT Cardinal would have been more susceptible to distortions of memory and subtle influence from either Dr. Schoberg or the CID agent. The danger of confabulation was intensified by the subjective nature of SGT Cardinal's recollection and the lack of corroborating evidence. Sergeant Cardinal's hypnotically induced identification of appellant as his assailant was not based upon the recollection of any special physical characteristics which would distinguish appellant from Bell. As a result, his identification cannot be tested by comparing a description of the alleged assailant with the two suspects. The only detail related by SGT Cardinal was that his assailant was kneeling next to the foxhole, turned, rose, and shot him. This recollection is similar to PFC Mendoza's testimony which identified Bell as the assailant.

The failure to exclude the CID agent from participation in the hypnotic session and the lack of corroborating evidence lead us to conclude that the hypnosis performed in this case was not shown to be a reasonably reliable means of refreshing SGT Cardinal's memory. Sergeant Cardinal's hypnotically-refreshed testimony should not have been admitted in appellant's trial.

■ Since the hypnotically-refreshed testimony played a significant role in appellant's conviction for attempted murder (Charge II), that conviction cannot stand. Because we are setting appellant's conviction aside on procedural grounds, no decision can be made regarding the sufficiency of the evidence with respect to this offense. See United States v. Sarmiento-Perez, 667 F.2d 1239 (5th Cir.1982), cert. denied, 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 75 (1982). A rehearing shall be ordered.

## III

### Sufficiency of the Evidence of Unpremeditated Murder

■ The only eyewitnesses to the murder of SGT E are appellant and Bell; consequently, much of the available evidence is circumstantial. A review of the scene at Point Seven reveals important facts about the shooting. The body of PFC M was found half seated behind the scorer's table with its back on the ground and its legs on the scorer's bench, its hand still gripping a pencil ready to record the next shot. From his body position, we conclude that PFC M was shot first. The ballistic evidence establishes that the fatal round was fired from Bell's weapon. SGT E died of a gunshot wound fired six inches to two feet from his back. His body was found face up with its head close to the stairs leading down to Point Six and its feet pointed toward Point Eight.

All of appellant's statements place him in the foxhole at the time SGT E was murdered. A man of short stature (five feet, three inches), appellant testified that when he stood in the foxhole, the walls of the foxhole came to his shoulders. As one faced downrange, a firing step two feet high was on the right side of the foxhole. The foxhole itself was made of concrete. The concrete walls of the foxhole rose three to twelve inches above the ground. Given the position of the sandbags and appellant's stature, if appellant stood on the firing step then his torso would be above the rim of the foxhole. Sergeant E was five feet, nine inches tall. We find, from the position of his body, that SGT E stood to the left, downhill side, of the scorer table as he looked downrange. The ground sloped away from the foxhole at this position; the upper rim of the foxhole stood about twelve inches above the surface of the ground. The fatal round entered SGT E's back with a mild upper trajectory and emerged through his chest. Ballistic evidence did not indicate which weapon fired the fatal round. Standing alone, the physical evidence does not establish or deny appellant's guilt.

Appellant argues that Bell murdered SGT E as part of the brutal rampage on the firing range. In support of his theory,

appellant points to testimony from eyewitnesses and Bell's admission at trial that he shot SGT E. The factual details of Bell's testimony are inconsistent with the other evidence so we attach little weight to his admission. However, the factual circumstances of the shooting at Firing Point Seven and the eyewitness testimony lend persuasive support to appellant's contention. Following the outburst of shots at Firing Point Eight, at which time Bell murdered both the scorer and safety NCO, he was observed rapidly descending the narrow flight of steps down the slope of the ravine to Firing Point Seven. Shortly thereafter, a burst of fire ensued from that firing point. The fact that both the scorer and safety NCO were shot almost simultaneously from behind suggests that the two fatal rounds were fired by Bell. Although the appellant, if he were standing on the firing step, could have turned and shot SGT E from his foxhole, it is much more likely that Bell continued his bloody rampage by shooting both individuals in the back.

The most significant evidence tending to establish appellant's guilt is his confession. Prior to his confession, appellant voluntarily submitted to a polygraph examination and was subsequently interviewed by two CID agents. After repeatedly denying any involvement in the murders, appellant stated: "I shot him [SGT E] okay, I shot him." For the remainder of the interview, the agents sought to obtain details of the killing. In so doing, the agents suggested possible ways the shooting took place. Finally, a typewriter was produced and the agents typed appellant's confession. Appellant reviewed, annotated and signed it. In his confession appellant stated that he was in his foxhole when he heard a noise behind him. He turned and saw Bell. Bell pointed a rifle to his head and ordered him to shoot SGT E. Appellant relented and shot SGT E in the back at a range of two feet. Appellant's detailed account as to how the shooting of SGT E took place is not supported by the facts.

Appellant challenged his confession at trial, testifying that he had been cajoled into making an involuntary statement. We note that appellant was repeatedly advised of his rights under Article 31 of the Uniform Code of Military Justice, 10 U.S.C. § 831. Evaluating all the circumstances, we are convinced that appellant was properly advised of his right to remain silent and voluntarily waived the same. In rebuttal, appellant introduced the testimony of Dr. Richard Gushwa, Chief of the Department of Psychiatry at the 121st Evacuation Hospital. He testified that appellant was below normal intelligence and that his thoughts became disorganized under stress. Dr. Gushwa opined that appellant was easily intimidated and would confess to the "Lindbergh Kidnapping" if he were isolated with a persuasive authority figure. Of course, the argument that appellant, as a result of his personality, was intimidated by the CID and confessed to a crime he did not commit is subject to more than one interpretation. Appellant could have been intimidated just as readily by his roommate, Bell, into becoming a full participant in the "revolution." However, absent any evidence of a premeditated plan, the time sequence was too short for appellant to have participated in the initial burst of gunfire that resulted in the deaths of both the scorer and SGT E. Accordingly, appellant's admission to the CID is not supported by the weight of the available evidence. We find the evidence of record is insufficient to support appellant's conviction of unpremeditated murder.

Because the action of this Court results in the setting aside of both charges, we do not address the remaining assignments of error. Our disposition of this case also renders appellant's petition for a new trial moot.

The findings of guilty and the sentence are set aside. The Specification of Charge I and Charge I are dismissed. A rehearing may be ordered as to the Specification of Charge II and Charge II by the same or different convening authority.

Senior Judge McKAY and Judge COHEN concur.