UNITED STATES, Appellee,

v.

James A. ROBINSON, Jr., Staff Sergeant, U.S. Air Force, Appellant.

No. 54591.
ACM 24420.

U.S. Court of Military Appeals.

Aug. 15, 1988.

For Appellant: *Mark A. Goldsmith*, Esq. (argued); *Clyde B. Pritchard*, Esq., *Colonel Leo L. Sergi, Major Charles E. Ambrose, Jr.* (on brief); *Captain Henry J. Schweiter.*

For Appellee: *Captain Marc Van Nuys* (argued); *Colonel Joe R. Lamport* and *Lieutenant Colonel Robert E. Giovagnoni* (on brief); *Colonel Kenneth R. Rengert* and *Major Joseph S. Kistler.*

*Opinion of the Court*

EVERETT, Chief Judge:

Contrary to his pleas, appellant was convicted by general court-martial of premeditated murder, rape, and forcible sodomy, in violation of Articles 118, 120, and 125, Uniform Code of Military Justice, 10 U.S.C. §§ 918, 920, and 925, respectively. The members sentenced him to confinement for life, total forfeitures (a portion of which was later suspended), reduction to the lowest enlisted grade, and a dishonorable discharge. The convening authority approved the sentence, and the Court of Military Review affirmed. 21 M.J. 937 (1986).

We granted appellant's petition for review to consider this issue:

> WHETHER APPELLANT'S "ADMISSIONS," MADE DURING HIS INTERROGATION, SHOULD HAVE BEEN SUPPRESSED.

I

Senior Airman Nancy Nittler, the victim of the alleged crimes, had been on duty on the night of April 13, 1982, at the service-call desk of the Engineer Building at Ramstein Air Base, Federal Republic of Germany. She was killed late that night or very early the next morning. The gruesome details of these crimes are recited in the opinion of the court below (*id.* at 938) and need not be repeated here, except as they relate to the granted issue.

Robinson first came to the attention of the Air Force Office of Special Investigations (OSI) after he had appeared at the security-police desk at Ramstein Air Base on April 16, 1982, and stated that he had information concerning Airman Nittler's death. He was taken to the local OSI office, where he told investigators that he had driven by the crime scene between 11:30 p.m. and 12:30 a.m. on the night in question. Appellant stated that he had seen a tall, thin, light-haired male figure through a window of the room where Nittler had been killed. This person had made several striking motions with his right hand. When pressed for a possible identification, Robinson named Sergeant Kevin B. Curtis, who not only fit his description but also had been apprehended in the vicinity of the Engineer Building soon after the crime was discovered. Appellant told the investigators that he had not thought much about the scene he had observed and had driven on home. He had waited 2 days to report the events because he needed to collect his thoughts.

About 8 days later, the OSI interviewed Robinson's wife and questioned her about his whereabouts on the night of the crimes. That same day appellant submitted to a polygraph examination after being advised of his Article 31(b) rights, 10 U.S.C. § 821(b).[1] Robinson then agreed to participate in the interviews which give rise to this appeal.

On April 27 and 29, 1982, he was interviewed while apparently being in an hypnotic state induced by Dr. Russell Hibler, an Air Force psychologist. These interviews were videotaped and were later played during trial in connection with cross-examination of Dr. Hibler when he was called by the defense to testify. Prior to his first interview under hypnosis, appellant repeated his general statement concerning his observations on the night of the crimes. Under hypnosis, he expanded his account and described the race, build, and dress of the person he had seen. Robinson also related that he visualized this individual to be swinging a pipe.

1. *See* Uniform Code of Military Justice, 10 U.S.C. § 831(b). About April 19 an Airman First Class Slagel, who had been in the vicinity of the Engineer Building on the night of the crimes, helped the OSI produce a composite sketch of a person whom he had seen that evening. This sketch bore a striking resemblance to Robinson. Appellant has urged that at the time of the polygraph and hypnotically enhanced interview, he was already a suspect—apparently based on the evidence about this sketch and the interview of his wife by the OSI on April 24. However, we do not agree that the evidence compels this conclusion—especially since Slagel testified that he was sure that Robinson was not the person he had seen that evening.

At the second interview, conducted 2 days later, appellant reported that he could see a larger figure assaulting a smaller figure with an object bent at a ninety-degree angle and with a wire attached—much like a desk microphone. During this session, appellant added other details to his description of the attacker—who, according to Robinson, resembled his supervisor, Captain Fuller.

After this interview, he added that this person also looked like Airman Nittler's husband but was taller and heavier. About a week later OSI agents again interviewed Robinson, this time in order to determine whether he could more positively identify the assailant as Captain Fuller.

About 10:30 p.m. on July 2, 1982, Robinson arrived in an extremely emotional state at the service-call desk of the Engineer Building. He told Staff Sergeant Tenay, the noncommissioned officer on duty, that he wanted to talk to the investigators about the case; and so Tenay called the OSI. Robinson displayed some bizarre behavior and informed Tenay that he believed that Staff Sergeant (SSgt) Brownell—who according to appellant was involved in an extra-marital affair with the victim—had been the killer.

Special Agent (SA) Lofties, who had previously interviewed appellant about the crimes, and SA Burris responded to the call. When they arrived, Robinson told them that he had received threats against his family and that he believed he needed protection—which he had previously declined. He also provided the agents with information he had been withholding—about having observed an automobile at the Engineer Building on the night of April 13. Appellant asserted that he had previously omitted this detail in order to locate the owner himself. He also told Lofties and Burris that he believed Brownell had been the source of the telephonic threat he had received.

SA Lofties took a statement from appellant on July 7. It was then that Robinson's story began to change significantly. He informed Lofties that he had been untruthful in the hypnotically enhanced interviews in April. Robinson also stated that he had not actually seen the figures at the window but had really seen a "vision" of the scene after he had arrived home. When pressed, he said that he had seen the attack and thereafter had seen the figures in his "vision." [2] Robinson's description of this "vision" contained further details about the actual assault and a further identification of SSgt Brownell as the perpetrator.

Further changes in Robinson's account occurred when he was interviewed by SA Pearce on July 21. Then, for the first time, he informed the OSI agents that he had engaged in sexual intercourse with a bar girl on the night of the crime. Previously, he had only acknowledged talking to her.

In early September, Robinson told SSgt Brownell, who was a close friend of the Nittlers, that he regretted having identified Brownell as the killer but that at the earlier time he had believed that the assailant resembled Brownell. Appellant also volunteered information that Airman Nittler had made a sexual advance toward him—which he had rebuffed "because he was a married man."

At a party on September 15, appellant told Captain Fuller that he was depressed because he believed "that he could have prevented" Airman Nittler's murder; and he again stated "that he could identify the" perpetrator. Captain Fuller and two other individuals went to the Engineer Building with Robinson to reconstruct the crime scene. Along with appellant, Fuller stood outside the building, but only about half the distance from the building to the road where appellant claimed he had been driving on the night of the homicide. Fuller concluded that appellant could not have observed the crime from the road, as he had claimed. In turn, Fuller informed the OSI of his conclusion.

After evaluating the inconsistencies in Robinson's various interviews, the comments he had made to other servicemem-

2. There are indications in the record that Robinson believed he was clairvoyant.

bers, and his seeming untruthfulness as to his ability to observe the crimes, the OSI agents decided to question him as a possible suspect. On October 19, 1982, SA Lee and SA Thomas advised appellant of his Article 31(b) rights and then reinterviewed him about what had occurred on the night of April 13. This interview was scheduled to coincide with Robinson's duty hours, which did not conform with the normal work day. The session lasted about 13 hours—with one long break and a number of other interruptions. At the outset, Robinson appeared to be fresh and well rested. However, according to SA Lee, appellant had mentioned at the time that he was somewhat concerned about marital discord between his parents.

Initially appellant reiterated his earlier versions of his activities on the night of April 13—including his "visions" of the assailant. Asked about the clothing he had been wearing that night, Robinson replied that he had worn blue jeans, a plaid shirt, and a blue jacket. The agents then informed him that a person in similar clothing had been seen near the building that evening. They also told Robinson that the experiment conducted by Captain Fuller had indicated that appellant could not have observed the crime scene from his vehicle.

Robinson then began to change his story. He now admitted that he had left his car and gone to the building, where he had seen the assault on Airman Nittler through a window; and he gave the agents a graphic description of the crime. Thereupon, SA Lee told appellant that, if he had been inside the building, he should reveal this fact. Lee also informed him that the OSI was in possession of the jacket he said he had worn that night. Robinson expressed disbelief; and he refused to continue the interview until he was shown the jacket. A delay of about 90 minutes ensued while the evidence custodian produced the jacket.

Lee told appellant that the jacket would be examined by the crime laboratory for forensic evidence and again informed Robinson that, if he had been inside the Engineer Building, he should not withhold this information. Robinson's story began to shift again. He admitted that he had been in the building and had seen the victim lying on the floor of the technical order room. Indeed, he described her wounds in some detail. However, Robinson contended that he himself had been assaulted by an unknown person.

In response to further questions from Lee, appellant recited that he had left the building, sat in his vehicle, and pondered what to do. He then reentered the building and looked for the body, but it was no longer in the technical order room. He also stated that he had straightened up the furniture—an action which would account for any fingerprints of his that might be found in the room.[3] SA Lee continued to ask appellant why he had not called the authorities; but Robinson offered no explanation for this omission or for his decision to straighten up the furniture.

Appellant next described his search for Airman Nittler's body and related how he had found a trail of blood from the technical order room to the career counselor's office. Lee questioned his account as to the location of the victim's body; but appellant persisted in his description of this detail. Ultimately, Lee decided that he—not Robinson—was in error on this point.

Shifting to the question of sexual intercourse, the investigators then told appellant that an analysis of the sperm found in Nittler's body could point directly to the person who had engaged in sexual intercourse with her. Shortly after being told she may have been alive at the time of intercourse, appellant told the investigators that, after finding Airman Nittler, he had intercourse with her, but he claimed that he had not engaged in sodomy with her. Robinson stated that he might have gotten blood on his jacket at the time because he

---

**3.** Appellant also made an inculpatory remark by telling the agents that he had righted a cot in the technical order room. Until then the agents had not known that the cot had been overturned.

had laid it beside her head in a pool of blood.

There were discussions about the possibility of his palm prints being in the career counselor's office and about his footprint being found there. Robinson told the investigators that when he first came in the building, he had dodged "a sucker punch" and then was shoved to the floor in the technical order room. He advised SA Lee that he believed the attacker was Ron Stenson, a member of appellant's squadron.

SA Lee asked Robinson to describe his actions after having intercourse with the victim. Appellant responded that he had left the building, gone home, eaten, watched television, and then enjoyed "a good night's sleep."

At this point in the interview, it was near midnight; and Robinson's normal duty day would have been near an end. He told the agents that he was tired and wanted to see his wife. After a few more questions, Lee told appellant that they would break, and appellant agreed to return the following day. Robinson shook hands with Lee and was allowed to leave. Instead of returning the next morning, Robinson visited a psychiatrist and was hospitalized for observation. After his release, he once more began to assert that he had merely driven by the Engineer Building and had not left his autombile.

At trial, Robinson's defense centered on an attempt to show that his inculpatory remarks to SA Lee and SA Thomas should not be believed. To this end, the defense team played the tapes of the hypnotically enhanced interviews and called three expert witnesses: Dr. Martin T. Orne, a recognized authority in the field;[4] Dr. Russell Hibler, who had conducted these interviews; and Dr. Neil Hibler, a forensic psychologist with OSI Headquarters.[5] Defense counsel sought to show that the interviews in April had caused Robinson to create false memories of events which did not exist.[6] In turn, appellant's belief in the reality of these memories led him—under the stress of the October 19 interview—to make inculpatory remarks, including his admission of sexual intercourse with the victim when she was either dead or near death from the bloody beating and stabbing.

Dr. Orne offered two theories as to how the technique used by Dr. Russell Hibler in interviewing Robinson under hypnosis in April might have affected the content of his admissions to the OSI agents in October. In the first place, since Dr. Russell Hibler had used a "television" technique—"zooming in" on certain events, stopping the action, and going forward and backward—appellant had been induced to fill in details on his own and ultimately had been led to state that he had entered the Engineer Building, observed Airman Nittler, and had sexual relations with her while she was dead or dying. Dr. Orne's second and somewhat "more conjectural" theory was that, pursuant to post-hypnotic suggestion experienced in April, Robinson had gone

4. Dr. Orne's writings on forensic hypnosis are well known. *See, e.g.,* Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int'l J. Clinical & Experimental Hypnosis 311 (1979); M. Orne, D. Soskis, D. Dinges, and E. Orne, "Hypnotically Induced Testimony," in *Eyewitness Testimony: Psychological Perspectives* 211 (G. Wells and E. Loftus, eds. 1985). His guidelines for hypnotically-enhanced interviews were used by the New Jersey Supreme Court in *State v. Hurd,* 86 N.J. 525, 432 A.2d 86, 96 (1981). Dr. Orne chaired a panel of the Council on Scientific Affairs which produced a Report on *Scientific Status of Refreshing Recollection by the Use of Hypnosis,* 253 J.A.M.A. 1918 (1985). For further description of his qualifications, *see People v. Shirley,* 31 Cal.3d 18, 181 Cal.Rptr. 243, 270 n. 45, 723 P.2d 1354, 1381 n. 45 (1982).

5. In the seemingly small world of forensic hypnosis, the three defense witnesses were all colleagues. Dr. Russell Hibler and Dr. Neil Hibler were twin brothers and members of the Air Force. Dr. Orne had collaborated with Dr. Neil Hibler in writing a chapter in a handbook concerning use of hypnosis in federal criminal investigations.

6. This phenomenon—termed confabulation by forensic hypnotists—involves "fill[ing] in details from the imagination in order to make an answer more coherent and complete." *See Rock v. Arkansas,* —— U.S. ——, 107 S.Ct. 2704, 2713, 97 L.Ed.2d 37 (1987).

into an hypnotic state during the October interview. According to this expert, if either theory applied, the results of the October interview were questionable—both as to reliability and voluntariness.

Dr. Orne also testified that, after reviewing all of the evidence, he believed that Robinson genuinely could not remember the events of the night of April 13. He premised this hypothesis on his conclusion that appellant had been intoxicated at that time and had suffered from severe memory gaps as a result. In Dr. Orne's opinion, Robinson had filled in these gaps because of the hypnotist's suggestion that he would be able to remember more and more about the events of that night and because of appellant's own belief that he was clairvoyant.

Yet, even some of the other defense evidence did not conform with Dr. Orne's theories. From listening to the tapes of the two interviews conducted in April, Dr. Orne had concluded that Robinson had been in an hypnotic state; but, on the basis of an extensive review of these tapes—performed both before trial and later in court—Dr. Neil Hibler testified that certain physical phenomena led him to conclude that appellant had been simulating an hypnotic state. Both Dr. Russell Hibler—who had been the hypnotist—and Dr. Neil Hibler were of the opinion that, due to the long interval involved, the two interviews in April, when hypnosis was used, would have had no effect on appellant's discussion in October with the OSI agents. Indeed, Dr. Orne himself conceded that he could find no direct connection between the events in April and Robinson's inculpatory statements 6 months later; and he acknowledged that his hypothesis as to the later effects of the hypnotically enhanced interviews was simply an alternative to be considered in evaluating all the evidence in the case.

During cross-examination, Dr. Orne admitted that there were three problems with his hypotheses. First, contrary to his premise that there had been "lacunae" or memory deficits due to appellant's intoxication on the night of April 13, Robinson had claimed throughout the investigation that he had an excellent memory of that night; and an extensive sanity examination of appellant, performed after the October interviews, failed to reveal any memory deficits. Secondly, Dr. Orne could not reconcile his theory with appellant's extremely accurate knowledge of certain details of the crime. Finally—and perhaps most telling—was Dr. Orne's testimony that if Robinson had, in fact, falsely confessed to crimes some 6 months after being hypnotized, this would have been unique in his own experience with forensic hypnosis.[7]

## II

### A

Appellant argues that his statements to the OSI agents in October were involuntary and were also unreliable. In this connection he points to the length of the interview, and he suggests that the interview was conducted in "an emotionally charged atmosphere." Moreover, he claims that his weak character—as evidenced by his belief in his own clairvoyance, his alcohol abuse, and his tendency to inflate his importance and his achievements—rendered him susceptible to manipulation by the investigators. Finally, Robinson contends that any statements made by him after the hypnotically enhanced interviews in April were *per se* inadmissible.

The military judge's findings of fact (21 M.J. at 944) as to the voluntariness of Robinson's statements undercut appellant's contentions.[8] For example, the judge found that appellant was properly advised of his Article 31(b) rights at the outset of the interview; that the OSI agents utilized

---

**7.** Dr. Neil Hibler went even further in stating not only that it would be a first in his experience, but also that he had never read of such a case in the literature on forensic hypnosis.

**8.** The evidence in the record of trial amply supports these findings; and so they should not be disturbed. *See United States v. Burris*, 21 M.J. 140, 143 n. 7 (C.M.A.1985).

no threats, force, promises, or deception to induce appellant's statements; that, although the interview took considerable time, numerous interruptions occurred, and the interview had been purposely scheduled to coincide with appellant's normal tour of duty; that appellant was a noncommissioned officer "of some experience," with a high school diploma and considerable military service; and that the interview had been conducted in a relaxed atmosphere.

Far from being "emotionally charged," the October interview was conducted in a relaxed atmosphere. Unlike the situation in *United States v. Collier*, 1 M.J. 358 (C.M.A.1976), the investigators here did not prepare the accused for a confession by playing on his emotions over an extended period of time before asking him about the crime.

Admittedly, Robinson related some unusual dreams and demonstrated behavior which one would not expect from a noncommissioned officer of the Armed Forces. Moreover, he was hospitalized at his own request for medical observation on the day after his session with the OSI agents. However, the evidence of record does not indicate that he was mentally unstable at that time; and there is no showing that the OSI agents were seeking to use knowledge of any emotional weakness on his part as a means to obtain a confession.

Robinson exhibited an almost pathological need to discuss the crimes that had been committed. On no less than nine occasions he voluntarily told investigators or other persons that he had information about these crimes. However, his behavior during the interview in October does not suggest that he was easily led. When the investigators told him they had his jacket, he adamantly refused to continue with the interview until they produced it; and at two other points in the interview he challenged SA Lee's perception of the crime scene and ultimately convinced the investigator that appellant—not Lee—was correct.

Certainly, a character defect or personality quirk does not automatically render an accused's statement inadmissible. Even if an accused has some inner compulsion to make a confession and this is known to the investigators, his statement is not thereby rendered inadmissible. *Cf. United States v. Wheeler*, 22 M.J. 76 (C.M.A.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986); *see Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *see also Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

**B**

■ The unique aspect of this case is the use of hypnotism to enhance appellant's recollection of events surrounding the crimes. Hypnotism, of course, is not a recently discovered phenomenon. Instead, it has been recognized for many centuries. For example, there are ancient legends about persons who were hypnotized by the swinging of a watch or other shining object before their eyes. Hypnotism was used by Sigmund Freud in some of his early work and played a part in the development of his theory of the subconscious mind. In recent decades, hypnotists have even performed as entertainers before large audiences.

Investigators have begun to use hypnosis to retrieve the repressed recollection of witnesses of crimes, accidents, or other startling events. However, scientists have disagreed as to the reliability of evidence resulting from hypnotically refreshed recollection. One report concludes that

> when hypnosis is used to refresh recollection, one of the following outcomes occurs: (1) hypnosis produces recollections that are not substantially different from nonhypnotic recollections; (2) it yields recollections that are more inaccurate than nonhypnotic memory; or, most frequently, (3) it results in more information being reported, but these recollections contain both accurate and inaccurate details. When the third condition results, the individual is less likely to be able to discriminate between accurate and inaccurate recollections. There ... [is] no ... support [for] a fourth alterna-

tive ... that hypnosis increases remembering of only accurate information.

Contrary to what is generally believed by the public, recollections obtained during hypnosis not only fail to be more accurate but actually appear to be generally less reliable than nonhypnotic recall. . . .

Council on Scientific Affairs, *Scientific Status of Refreshing Recollection by the Use of Hypnosis*, 253 J.A.M.A. 1918, 1921 (1985).

One problem is that the "hypnotized subject is highly susceptible to suggestion, even that which is subtle and unintended." *State v. Mack*, 292 N.W.2d 764, 768 (Minn. 1980). According to one expert:

Hypnosis is, almost by definition, a state of increased suggestibility. . . . [S]uch suggestions cannot be avoided. The suggestive instructions and cues provided to the subject need not be, and often are not, verbal. The attitude, demeanor, and expectations of the hypnotist, his tone of voice, and his body language may all communicate suggestive messages to the subject. Especially powerful as an agent of suggestion is the context and purpose of the hypnotic session. Most hypnotic subjects aim to please.

Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Cal.L.Rev. 313, 333 (1980).

Added to the problem of suggestibility is that of "confabulation." *Id.* at 335. *See* n. 6 to this opinion. Because the hypnotic subject wishes "to comply with the hypnotist's suggestions ... the hypnotically recalled memory is apt to be a mosaic of (1) appropriate actual events, (2) entirely irrelevant actual events, (3) pure fantasy, and (4) fantasized details supplied to make a logical whole." Diamond, *supra* at 335.

Finally, the reliability of hypnotically enhanced testimony is diminished by "memory hardening," which the Supreme Court of Minnesota described in this way:

A witness who was unclear about his "story" before the hypnotic session becomes convinced of the absolute truth of the account he made while under hypnosis. This conviction is so firm that the ordinary "indicia of reliability" are completely erased, and hypnotic subjects have been able to pass lie detector tests while attesting to the truth of statements they made under hypnosis which researchers knew to be utterly false. It would be impossible to cross-examine such a witness in any meaningful way.

*State v. Mack, supra* at 769 (footnote omitted).

Because of the possible unreliability of testimony given by a witness after he has been subjected to hypnosis, courts have differed widely as to admissibility of such testimony.[9]

In some jurisdictions, the testimony is automatically excluded. *See, e.g., State v. Collins*, 296 Md. 670, 464 A.2d 1028 (1983), *overruling Harding v. State*, 5 Md. App. 230, 246 A.2d 302 (1968); *Commonwealth v. Kater*, 388 Mass. 519, 447 N.E.2d 1190 (1983); *People v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 723 P.2d 1354 (1982); *State v. Mack, supra.*

Elsewhere, hypnotically induced testimony is allowed only if various procedural safeguards were observed when the hypnosis was performed. Thus, in *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981), the New Jersey Supreme Court imposed these six requirements:

First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. . . .

Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecution, investigator, or defense. . . .

Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded. . .

---

**9.** See cases collected by Judge Su-Brown in *United States v. Harrington*, 18 M.J. 797, 802 (A.C.M.R.1984), and by the Supreme Court in

*Rock v. Arkansas,* —— U.S. ——, 107 S.Ct. 2704, 2712–13, 97 L.Ed.2d 37 (1987), which cites *Harrington. Id.,* 107 S.Ct. at 2713 n. 16.

Fourth, *before* inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them....

Fifth, all contacts between the hypnotist and the subject must be recorded....

Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session...

*Id.,* 432 A.2d at 96–97.

In other cases, emphasis has been placed on the procedural safeguards employed in an hypnotically-enhanced interview with a witness, but no *per se* rule has been imposed. *See, e.g., McQueen v. Garrison,* 814 F.2d 951 (4th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 332, 98 L.Ed.2d 359 (1987); *Sprynczynatyk v. General Motors Corporation,* 771 F.2d 1112 (8th Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986); *United States v. Valdez,* 722 F.2d 1196, 1203 (5th Cir.1984); *State v. Armstrong,* 110 Wis.2d 555, 329 N.W.2d 386 (1983). In *Harker v. Maryland,* 800 F.2d 437 (1986), the Fourth Circuit upheld admission of hypnotically-induced testimony, since there had been some procedural safeguards in connection with the interview under hypnosis and also because there was independent corroborating evidence.

A third judicial approach is to treat the prior hypnosis of a witness as a circumstance which affects credibility but does not make the testimony so unreliable that it must be excluded from evidence. Moreover, a few "courts conduct an individualized inquiry in each case." *See Rock v. Arkansas,* — U.S. —, 107 S.Ct. 2704, 2713 n. 16, 97 L.Ed.2d 37 (1987).

Recently, in *Rock,* the Supreme Court reviewed a conviction in a case where the trial court had ruled that, under Arkansas evidentiary rules, hypnotically refreshed testimony of the defendant was inadmissible and that her testimony would be limited to reiteration of statements she had made to the doctor prior to hypnosis as those comments were reported in the doctor's notes. Writing for five justices, Justice Blackmun explained that the Arkansas *per se* rule prohibiting admission at trial of any

defendant's hypnotically-refreshed testimony violated a defendant's "right to testify in" his "own behalf," which "has sources in several provisions of the Constitution." *See* 107 S.Ct. at 2709. *Cf. Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

After pointing out that guidelines "do provide a means of controlling overt suggestions," Justice Blackmun observed:

The more traditional means of assessing accuracy of testimony also remain applicable in the case of a previously hypnotized defendant. Certain information recalled as a result of hypnosis may be verified as highly accurate by corroborating evidence. Cross-examination, even in the face of a confident defendant, is an effective tool for revealing inconsistencies. Moreover, a jury can be educated to the risks of hypnosis through expert testimony and cautionary instructions. Indeed, it is probably to a defendant's advantage to establish carefully the extent of his memory prior to hypnosis, in order to minimize the decrease in credibility the procedure might introduce.

We are not now prepared to endorse without qualifications the use of hypnosis as an investigative tool; scientific understanding of the phenomenon and of the means to control the effects of hypnosis is still in its infancy. Arkansas, however, has not justified the exclusion of *all* of a defendant's testimony that the defendant is unable to prove to be the product of prehypnosis memory. A State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections. The State would be well within its powers if it established guidelines to aid trial courts in the evaluation of posthypnosis testimony and it

may be able to show that testimony in a particular case is so unreliable that exclusion is justified. But it has not shown that hypnotically enhanced testimony is always so untrustworthy and so immune to the traditional means of evaluating credibility that it should disable a defendant from presenting her version of the events for which she is on trial.[10]

*Id.*, 107 S.Ct. at 2714.

In the case at bar, Robinson is not seeking to offer testimony. Instead, he wishes to exclude evidence of pretrial statements that he made to OSI agents. Thus, we are not presented with the constitutional claim that was made in *Rock v. Arkansas, supra,* and which was upheld there by the Supreme Court. However, some of the majority's rationale in *Rock* suggests that here we should not apply a *per se* rule of inadmissibility. As the Supreme Court observed, "Certain information recalled as a result of hypnosis may be verified as highly accurate by corroborating evidence." In this case, there was corroboration of statements made to the OSI agents in October. Secondly, just as "a jury can be educated to the risks of hypnosis through expert testimony and cautionary instructions," the members of the court-martial were educated about such risks by testimony from Dr. Orne, probably the foremost American authority on forensic hypnosis, and from two other highly qualified experts, one of whom had performed the hypnosis of appellant. Furthermore, the evidence "establish[ed] carefully the extent of ... [Robinson's] memory prior to hypnosis"; and the defense was well positioned to demonstrate how appellant's statements to the OSI agents might have been influenced by

"suggestibility," "confabulation," or "memory hardening."

The length of time between the two interviews under hypnosis in April and the session with the agents in October, and the great difference between what Robinson said under hypnosis and what he said later, minimize the likelihood that hypnosis had any impact on his statements to the OSI. Moreover, the hypnosis was performed by a highly qualified expert under circumstances that lessen the likelihood of improper suggestion. Significantly, when later he was being interviewed by the OSI agents, Robinson did not display any willingness to accept blindly their theories about the crimes; and, in one instance, appellant convinced the investigator that his own hypothesis was in error and that Robinson's account was correct. Finally, we note that at trial Dr. Neil Hibler even expressed doubt that appellant ever had been in an hypnotic state. We conclude, therefore, that under the circumstances of this case, appellant's pretrial statements to the OSI agents were not so intrinsically unreliable that they could not properly be admitted in evidence by the military judge.

Furthermore, even though use of hypnosis in interviewing Robinson in April is relevant to the voluntariness of his statements in October, *cf. Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954), it is clear that this hypnosis did not affect the voluntariness of appellant's October statement. Instead, from the outset, appellant wished to discuss the crime with others; and this predisposition on his part, rather than any action by the hypnotist, led to his statements to the OSI.[11]

10. *See* 107 S.Ct. at 2716. Chief Justice Rehnquist, writing for the four dissenters, asserted that the Arkansas *per se* rule of exclusion "was an entirely permissible response to a novel and difficult question" and constituted a reasonable restriction on a defendant's right to present evidence.

11. Appellant has also contended that the OSI violated Air Force Regulation 124–14, dated December 17, 1981, which concerns Forensic Hypnosis and which states in paragraph 2b, "Subjects of investigations who may be prosecuted

must not be hypnotized unless the subject or subject's counsel requests it." However, when he was hypnotized, Robinson was not the "subject" of an investigation; and hypnosis was used in a bona fide attempt to obtain information from him about crimes which—on the basis of his comments—were believed to have been committed by someone else. We agree with the court below that this provision in the regulation was intended to prevent use of "hypnosis as a means of coercing subjects of investigations to confess," and therefore, "it addresses the issue of voluntariness." 21 M.J. 937, 944. *Cf. Leyra*

### III

We conclude that the evidence in this record fully supports the military judge's findings and makes clear that appellant's admissions were voluntary and sufficiently reliable to be submitted to the court-martial members.

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COX and SULLIVAN concur.

---

*v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954). In view of the judge's findings that Robinson did not experience a self-induced trance during the October interrogation and that the hypnosis had no impact on the statement he made at that time, it is clear that the policy of the regulation was not violated in any way.